IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

ELDOMINIC RAMSEY and     :
    EDRICK A. RAMSEY, III,   :
        Plaintiffs       :
                       :
       v.           :      1:17-cv-00078-MSM-PAS
                       :
CITY OF PAWTUCKET, et al,    :
        Defendants     :

## MEMORANDUM AND ORDER

Mary S. McElroy, United States District Judge

The plaintiffs, 27-year-old Eldominic Ramsey (Eldominic) and his 42-year-old uncle, Edrick Ramsey (Edrick),[1] have turned to federal court to redress what they contend was unbridled police conduct resulting in the unlawful detention of one and the false arrest, imprisonment and malicious prosecution of the other. The defendants, on the other hand, view what happened as an example of determined law enforcement investigation that succeeded despite the attempt of plaintiff Edrick

---

[1] As will be seen, this case unfolded in two stages, temporally and factually. On March 2, 2014, a traffic stop occurred which allegedly resulted in an unconstitutionally-prolonged detention. Eldominic's claims in Counts I, II and III arise from that. Some months later, as a result of that stop, Edrick was arrested, an event that gave rise to his claims under Count I, II, and IV through VI.
    To avoid confusion, the plaintiffs will be referred to by their first names. No disrespect is intended.

Ramsey to stymie it.  In this Court's view, however, the investigatory stop that began this case was so prolonged beyond the time required to resolve the traffic infraction that initially justified it, that the conclusion is inescapable that the constitutional rights of the vehicle's passenger were violated.  In the ordinary case, the facts on which this conclusion rests are sufficiently undisputed that summary judgment on liability for the claim of unconstitutional detention would be appropriately granted to the plaintiff.  As explained below, however, this is not the ordinary case.  While the constitutional violation may be clear, it is not at all clear *whose* constitutional right was violated, and a legitimate dispute exists over that issue of material fact.  That dispute precludes what would otherwise be partial summary judgment granted in favor of plaintiff Eldominic Ramsey.  The undisputed facts, however, require the denial of summary judgment on Eldominic's claims to all defendants.  Moreover, for the reasons discussed below, the Court rejects the availability of qualified immunity for either of these defendant officers.

Therefore, plaintiff Eldominic's motion (ECF No. 34) is DENIED, however Counts I, II and III remain with respect to Eldominic for the limited purpose of determining whether he was the passenger in the vehicle.  As to the motions for summary judgment filed by Edrick Ramsey (ECF No. 34), and the defendants (ECF No. 32), both are DENIED.

# I

## THE FACTS

The case arose out of a traffic stop occurring at 5 p.m. on March 2, 2014, in the City of Pawtucket, Rhode Island.  Unless otherwise indicated, the facts below are undisputed.  The record does not reveal why the attention of Pawtucket Police Officers John Donley and Geoffrey Metfooney was drawn to a car driven by Renee Souza, bearing Rhode Island license plate 594048.  There was nothing apparently suspicious, illegal, or untoward about the way the car was proceeding, and no traffic infractions were seen or suspected.  The plaintiffs suggest that the reason Donley and Metfooney became focused on the vehicle was because its driver, Renee Souza, is white, and the male passenger, Eldominic Ramsey,[2] is black.   Whatever the motivation of the officers is of no moment.  They were entitled, from the distance of their cruiser, to run a license plate check on the car.

The report came back that R.I. plate 594048 was an expired registration, so at that point the officers had ample reason to stop the car, which they did.  This traffic stop is not challenged by the Ramseys.  Souza produced a valid printed registration, but for R.I. plate 59404<u>9</u> – off by one number.  For the next several minutes, Donley engaged Souza in a discussion that convinced the officer that a clerical error had occurred at the Registry of Motor Vehicles and, without giving her a citation, he

---

[2] As indicated earlier, the defendants dispute the identity of the passenger and contend that the passenger was in fact Edrick, the uncle.   For purposes of their motion for summary judgment on the constitutional claims of Eldominic, however, they assume *arguendo* the passenger was Eldominic.  (ECF No. 32-1, p. 16).

advised her she should straighten it out there.  There is essentially no dispute that in "maybe" five minutes[3] the officers had decided to take no action on the registration of the vehicle.  (ECF No. 40, Para 22).

All would have ended well, and Souza and her passenger would have been on their way but for the fact that the police decided to find out more about the passenger.[4]  The officers spent at least the next 20 – 23 minutes[5] detaining the two and questioning the passenger in an effort to ascertain his identity.  The passenger said he was carrying no identification and had never had a driver's license.  He gave his name as Eldominic Ramsey, gave a date of birth as XX/YY/ZZZZ, and gave an address in the City of Providence.[6]

_____

[3] The Ramseys claim the registration issue was resolved in "five minutes or less."  The officers assert it took "maybe five minutes, not very long."  The defendants' formulation is assumed true for purposes of this discussion.

[4] The defendants maintain this inquiry began while investigating the registration.  The plaintiffs, citing Donley's deposition testimony, contend the registration discrepancy was already resolved.  (ECF No. 38, Para 20).  In finding an unconstitutionally prolonged detention, the Court has accepted the defendants' version.

[5] Although the defendants dispute that the questioning went on for this long, all the evidence adduced by both parties indicates that it did.  Donley in his deposition said the duration of the stop was 25 minutes, but the police call log indicates 28 minutes (ECF No. 40, Para 57).  In their Memorandum, the Defendants cite Donley's belief the duration was 25 minutes and reference the call log's 28 minutes.  (ECF 32-1, p. 6).  Eldominic's deposition estimate for the length of the stop was 30 – 40 minutes.

[6] In keeping with the concern about identifying information, there is no need to publish the plaintiff's date of birth.  Suffice it to say that he gave the correct date of birth for Eldominic Ramsey and that the date of birth he gave matched database records for Eldominic Ramsey.  Similarly, the address given is irrelevant, except to say that the parties agree that it was the correct address for both Eldominic and Edrick Ramsey.  The plaintiffs maintain that Eldominic had never had a driver's license because he has mild cerebral palsy.  The defendants correctly point out that

He said his name was Eldominic Ramsey, he spelled it for Donley, and he gave his birthdate and address.  Renee Souza explained that he was her boyfriend, Eldominic Ramsey, that he was who he claimed to be, and that the address and birthdate he gave were correct.  But Donley became convinced that the passenger could not be named Eldominic Ramsey because the officer could not find any evidence of a driver's license, a criminal history or outstanding warrant attached to a person with that name and birthdate – a circumstance he felt was too "highly unusual" to be believed.  Donley also was skeptical because the passenger pronounced and spelled the name "Eldominic" slowly – in what he characterized as a "rehearsed" way –, and because Souza said she did not know Eldominic's middle name.  So the detention and questioning continued, even after a check with the Rhode Island State Police revealed a State Identity Card in the name of Eldominic Ramsey, bearing the same date of birth and address.[7]  Donley was not even then satisfied because he became convinced that the physical description on the card – a person 27 years old, 5'1" and 140 pounds – did not match the person he was seeing in the passenger seat.  Metfooney directed the passenger out of the car, saw the passenger out of the car, and believed he was shorter than Metfooney's height of 5'6" and was lighter than Metfooney's weight of 200 lbs.

---

the officers were not aware of that at the time of the detention, so it plays no part in the Court's consideration.

[7] A State Identification card is an alternative designed specifically for persons who hold no driver's license.  It is intended to serve as official identification. http://www.dmv.ri.gov/licenses/stateID

In the absence of anything concrete, the officers allowed the couple to leave. The plaintiffs maintain the stop consumed 45 minutes; the defendants assert it was much shorter – that the entire questioning of the passenger took something less than 20 minutes.  The Pawtucket police log indicates 28 minutes.  Again, this dispute is not material.  It is undisputed that the "mission" of the stop – the check on the registration – was resolved in five minutes or less.  From that point, the vehicle and its occupants were unlawfully detained, and how many minutes of illegal detention passed after that point does not matter with respect to liability.

The events up to this point form the basis of all three of Eldominic's claims. Metfooney's involvement with this case ended, but, back at the station, Donley pressed on.  He assumed the passenger was misrepresenting his identity to evade an outstanding warrant.   There were, however, no outstanding warrants or active criminal charges for either Ramsey.  Donley ultimately came up with an old, sealed arrest record for Eldominic Ramsey,[8] and a number of previous contacts for Edrick Ramsey – a person described on a booking card as 42 years of age, 5'6" and 185 pounds.  The booking card noted that Eldominic had a scar on his nose.[9]

---

[8] At the scene, Eldominic had told the officers he had once been arrested but that it had been dismissed.  Edrick's contacts were at least seven (7) years old.

[9] The presence or absence of a scar is significant.  Both Ramseys assert that Officer Donley ignored the fact that Eldominic has a very noticeable scar on his nose, which Edrick lacks.   Donley asserts he did not notice whether the passenger had a scar and did not notice any scar on anyone's booking card.  He did not mention in the affidavit used to obtain the arrest warrant any discrepancy about a scar between the person he saw and Edrick Ramsey's booking card.  The Ramseys maintain that he identified the passenger as Edrick in the face of major discrepancies in physical description, most notably Eldominic's scar that Edrick lacks.  They also point to the omission of this information from the warrant application as evidence of malice.

Now absolutely convinced that the passenger in the car was Edrick, not Eldominic, Donley concluded he had been lied to and procured an arrest warrant a few days later for Edrick Ramsey.  When Edrick found out about the warrant, many months later, he voluntarily went to the Pawtucket Police Station on October 1, 2014 and was arrested for obstruction of justice.  He was prosecuted predicated on his alleged giving of a false name, a charge that was dismissed on November 5, 2014, after three court appearances and five weeks.

## II.

## JURISDICTION AND LEGAL CLAIMS

The plaintiffs have set forth claims both under state tort law and federal and state constitutional law.  Counts I and II claim both Eldominic and Edrick suffered violations of their Fourth Amendment right to be free from unreasonable searches and seizures, as well as their correlate right under Art. 1 §6 of the Rhode Island Constitution.[10]  Count III contends that same prolonged detention of Eldominic Ramsey constituted false imprisonment as a common law tort.  Counts IV and V allege that Edrick Ramsey was the subject of a constitutional-level malicious prosecution, in violation of a cluster of state and federal constitutional provisions.[11]

_____

[10] As discussed infra, these claims arise from different facts.  Eldominic claims violations stemming from the detention of the vehicle; Edrick's claims stem from his arrest many months later and subsequent prosecution.

[11] Edrick invokes not only the Fourth and Fourteenth Amendments to the United States Constitution, but also the Fifth Amendment.  In the corresponding state constitutional claim, however, he cites only Art. 1, § 6, and omits any reference to a state due process provision.

Count VI is brought on behalf of Edrick, asserting that his prosecution for obstruction of justice was maliciously instigated and pursued by Donley, incurring liability under state tort law. The defendants are sued in both their official and individual capacities. With respect to the claims against them in their individual capacities, the plaintiffs seek monetary damages. With respect to the claims against them in their official capacities and against the Police Department, the Ramseys seek declaratory and injunctive relief, directed at the City's training, and destruction of the records of Edrick Ramsey's arrest.

## III.

## REVIEW ON SUMMARY JUDGMENT

A court's job when assessing a motion for summary judgment is to determine whether there exists a genuine dispute as to a material fact. A material fact is one that influences the outcome. "Summary judgment is only proper when 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Doe v. Trustees of Boston College*, 892 F.3d 67, 79 (1st Cir. 2018) (quoting Fed. R. Civ. P. 56(a)). When confronted with cross-motions, the Court must treat them independently. My inquiry, therefore, is to determine with respect to each Count of the complaint whether there are material facts sufficiently in dispute that "a reasonable jury could resolve the point in favor of the nonmoving party." *Id.* (quoting *Rivera-Muriente v. Agosto-Alicea*, 959 F.2d 349, 352 (1st Cir. 1992)).

# IV.

# LEGAL ANALYSIS

## A. Counts I and II: Prolonged Detention of Eldominic Ramsey

The starting point for this discussion is *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), whose holding that investigatory stops must be predicated on "reasonable suspicion," is now more than a half-century old. The past five decades have been filled with one refinement after another about when police can stop whom, for how long, with what purpose, and what they can do to the person stopped. This case brings into play those refinements as they involve the length of detention of those in an otherwise lawfully stopped vehicle. A "routine traffic stop" is analogous to a brief investigative detention under *Terry*. *Berkemer v. McCarty,* 468 U.S. 420, 439-40, 104 S.Ct. 3138, 3150, 82 L.Ed.2d 317 (1984). During that stop, the police may investigate the infraction and take certain steps to ensure their own safety. Typical steps include checking license, registration and insurance, and running checks for outstanding warrants. *United States v. Clark,* 879 F.3d 1, 4 (1st Cir. 2018). The driver may be ordered out of the car, *Pennsylvania v. Mimms,* 434 U.S. 106, 111, 98 S.Ct. 330, 333, 54 L.Ed.2d 331, 337 (1977), as may the passenger. *Maryland v. Wilson*, 519 U.S. 408, 414-15, 117 S.Ct. 882, 886, 137 L.Ed.2d 41, 48 (1997).

In 2005, the High Court turned its attention squarely to the duration of the stop for a routine traffic infraction.[12] In *Illinois v. Caballes*, 543 U.S. 405, 125 S.Ct.

---

[12] Two decades earlier, the Court had upheld a 20-minute detention of a *Terry*-like stop of a vehicle based on reasonable suspicion of criminal activity where the officers

834, 160 L.Ed.2d 842 (2005), while one officer was writing the defendant a ticket for speeding, a second officer walked his drug-sniffing dog around the car.  When the dog "alerted" next to the trunk, the officer searched the trunk, found marijuana and arrested the driver.  Having previously concluded that a "canine sniff" of already-seized luggage is not a search, *United States v. Place,* 462 U.S. 696, 707, 103 S.Ct. 2637, 2645, 77 L.Ed.2d 110, 121 (1983), the Court held that so long as the "sniffing" did not prolong the routine traffic stop, it was not unlawful.  "[A] seizure that is lawful at its inception can violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution."  *Caballes*, 543 U.S. at 407, 125 S.Ct. at 837.  A seizure justified by the interest in issuing a ticket reaches the "unreasonable" point "if it is prolonged beyond the time reasonably required to complete that mission."  *Id.*

The same principle governs an officer's questioning in connection with the stop. Inquiries, even about matters unrelated to the justification for the stop, do not reach that same "unreasonable" point "so long as those inquiries do not measurably extend the duration of the stop." *Arizona v. Johnson*, 555 U.S. 323, 333, 129 S.Ct. 781, 788, 172 L.Ed.2d 694, 704 (2009).  *Johnson* upheld the frisk of a passenger whose responses during brief questioning gave the officer a reasonable suspicion that he was armed.  *Id,* 555 U.S. at 334, n.2, 129 S.Ct. at 788, n. 2.

---

were diligent and did not unreasonably delay.  *United States v. Sharp,* 470 U.S. 675, 687-88, 105 S.Ct. 1568, 1576, 84 L.Ed.2d 605, 617 (1985).

*Rodriguez v. United States*, 575 U.S. 348, 135 S.Ct., 1609, 191 L.Ed.2d 492 (2015), enunciated the logical conclusion stemming from *Johnson* and *Caballes*. *Rodriguez* was much like *Caballes*, with one result-determinative factual difference: in *Rodriguez*, the canine tour around the vehicle occurred *after* the driver resolved the traffic infraction and a warning ticket had been written for driving on the shoulder of the road.  *Id.,* 575 U.S. at 352, 135 S.Ct. at 1613.  In contrast, in *Caballes,* the sniffing was simultaneous with the writing of the speeding ticket and therefore did not add time to the stop.  Drawing from *Caballes* and *Johnson*, both *supra*, the *Rodriguez* Court confirmed that unless independently supported by individualized suspicion of criminal activity, investigations into offenses unrelated to the traffic stop are not lawful if they prolong the stop beyond "the amount of time reasonably required to complete the stop's mission."  *Id.,* 575 U.S. at 361, 135 S.Ct. at 1618.[13]

In this case, neither side disputes that the "mission of the stop" was completed in about the first five minutes.  From that point on, the stop was prolonged for no reason other than Donley's desire to ascertain the passenger's identity … and his incredulity at the responses he was receiving.  It is not settled whether officers can, in fact, demand proof of a passenger's identity, *United States v. Clark,* 879 F.3d at 5, but the plaintiffs do not challenge Donley's demand that the passenger identify

---

[13] The seizure of methamphetamines resulting from the sniffing in *Rodriguez* was neither upheld nor deemed unlawful, but instead remanded for an inquiry into whether the sniffing rested on independent individualized suspicion of criminal activity.  *Id.*

himself, so that question need not be addressed.[14]  The question here is: what was it lawful for Donley to do *after* that initial demand, and after the passenger provided a name, date of birth, and address.

If *before* prolonging the stop, officers hear answers that give rise to reasonable suspicion of unrelated criminal activity, they may continue to press.  In *Clark,* for example, the passenger said he had lived in Maine for five years but had no Maine ID, gave three differing dates of birth, and claimed an age that didn't match either of them.  A match on one of the dates of birth then revealed outstanding warrants.  The tolerable duration of a stop, the Circuit declared, "is determined by the seizure's 'mission' – to address the traffic violation that warranted the stop and attend to related safety concerns."   *Clark,* 879 F.3d at 4.  The additional one minute of questioning occasioned by the inconsistent answers did not unlawfully prolong the stop.  *Id.* at 5.  Similarly, in *United States v. Dunbar,* 553 F.3d 48, 56 (1st Cir. 2009), the officers learned information while they were writing out the ticket that not only revealed an expired license, but also inconsistent answers of the driver and passenger.  In the instant case, however, the passenger gave a name, a date of birth and an address that were corroborated by Renee Souza; his answers were

---

[14] *See Hiibel v. Sixth Judicial District Court of Nevada, Humboldt County*, 542 U.S. 177, 187-88, 124 S.Ct. 2451, 2459, 159 L.Ed.2d 292, 304 (2004) (affirming the ability of states to require that *suspects* -- those reasonably suspected of committing or having committed a crime – disclose their names during a *Terry* stop).  *But see Clark,* 879 F.3d at 4, noting that Supreme Court precedent would indicate the same is true of passengers.

inconsistent neither with each other nor with any other information Donley had at the time.

This case is much like *United States v. Henderson*, 463 F.3d 27 (1st Cir. 2006). There, after completing his interaction with the driver, the officer focused on the passenger's identity. Most of the opinion explained why the Circuit found clearly erroneous the district court's findings of fact that led to its denial of a motion to suppress a handgun ultimately found on the passenger's person. The relevant portion of *Henderson* to this case is the part that holds that the prolonging of the traffic stop, for upwards of 20 minutes in order to pursue the passenger's identity, was unlawful:

> Kominsky's demand for Henderson's identifying information and his subsequent investigation of Henderson expanded the scope of the stop, changed the target of the stop, and prolonged the stop.
>
> … There was no particularized reason, discounting the discredited seatbelt violation, for Kominsky to launch into an investigation of Henderson. Kominsky might reasonably have asked Henderson for his license to see if he could drive the car back to Boston. But when Henderson responded that he did not have his license, there was, as the district court found, no further reason to inquire about his ability to drive Alford's car back to Boston. … Kominsky did not perceive any danger from Henderson, nor did Kominsky have any reason to suspect that Henderson was engaged in any kind of illegal activity.

*Id.* at 46-47.

The above could have been written about the Ramsey detention. Donley offered no articulable suspicion that the passenger here was engaged in any criminal activity. The continued detention was not "independently supported by individualized suspicion" of criminal activity. *Rodriguez,* 575 U.S. at 357, 135 S.Ct. at 1616. Donley's position that he found it "unusual" that a person would have no

driver's license, no criminal history and no warrants outstanding rests on nothing empirical, nor even any claim by him of a correlation between the lack of a driver's license and commission of crimes. Certainly, the absence of a criminal history or record of outstanding warrants would suggest the opposite. Moreover, his assertion that the passenger spelled the name "Eldominic" in a "rehearsed" way is entitled to no weight at all.[15] Not only didn't Donley describe what "rehearsed" meant, there are any number of reasons why a person might spell "Eldominic" for an officer in a stilted way: it is an unusual name and its holder may well be used to listeners not being familiar with it; and everyone, innocent or guilty, is nervous when questioned by police officers. And, most telling, there was no reason for the passenger to have anticipated being stopped and therefore, even if he were actually Edrick, there was no reason for him to "rehearse" giving a false name. Delay because of a defendant's "implausible answers and nervous demeanor," combined with the passenger's inability to identify the state in which he was licensed or remember his address, may warrant suspicion of a false name. *United States v. Chaney,* 584 F.3d 20, 26 (1st Cir. 2009). There were no such circumstances here.

By the time Donley completed his "mission" – explaining to Souza that she needed to have the Registry fix the discrepancy between registration and plate – he had uncovered no information of an incriminating or suspicious nature that would

---

[15] The Ramseys point to Donley's deposition testimony that characterized the way the passenger said the name differently: that it was "slow and deliberate, announcing the information before spelling it." The difference is immaterial. One can only guess that the Eldominics of this world, unlike the Johns or Jesuses, might be used to having to spell their names slowly.

warrant continuing to detain this vehicle.  *Compare United States v. Orth*, 873 F.3d

349, 357 (1st Cir. 2017) (reasonable to prolong detention  in order to frisk where high

crime area, occupants nervous and refused to open the glove compartment to find

car's registration, the passenger was aggressive and Orth would not to keep his hands

on the dashboard as directed).   At that point, federal law required that he release its

occupants.  As Rhode Island generally follows federal law in interpreting Art. I § 6 of

the state Constitution, and has not held to the contrary in this context,[16] the

passenger in the car can be said to have suffered a violation of his state constitutional

right to be free from unreasonable seizures, as well as his federally-guaranteed right

to the same.

### B.  Counts I and II:  Qualified Immunity with respect to Eldominic Ramsey

Having concluded that Eldominic Ramsey, if proven at trial to have been the

passenger, is entitled to a finding of constitutional violation under both the state and

federal Constitutions, the Court must determine whether the defendants are entitled

to qualified immunity.  Qualified immunity shields government officials performing

discretionary functions "insofar as their conduct does not violate clearly established

statutory or constitutional rights of which a reasonable person would have known."

*Ayala Serrano v. Cruz Lebron Gonzalez,* 909 F.2d 8, 13 (1st Cir. 1990), quoting

---

[16] *State v. Taylor,* 621 A.2d 1252, 1254 (R.I. 1993) (with rare exceptions and in order to afford greater protections to criminal defendants, Rhode Island "follows federal precedents and interprets article I, section 6, of the Rhode Island Constitution as identical to the Fourth Amendment to the United States Constitution." ).

*Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396, 410 (1982).

At the time of this stop in March 2014, federal law was clear that a routine traffic stop could not be prolonged beyond the time necessary to complete it, absent independent articulable suspicion of criminal activity.  Back in 2005, *Caballes* had employed the operative reference to the "mission" of the stop and declared that a seizure justified by the interest in issuing a ticket reaches the "unreasonable" point "if it is prolonged beyond the time reasonably required to complete that mission." *Caballes,* 543 U.S. at 407, 125 S.Ct. at 834.  *Henderson*, involving nearly identical facts as this, was decided in 2006.  And in 2010 the Circuit Court noted the holding of *Muehler v. Mena*, 544 U.S. 93, 101, 125 S.Ct. 1465, 1471, 161 L.Ed.2d 299, 308 (2005), that reasonable suspicion is not required to question about immigration status so long as the detention is not prolonged thereby.   *Estrada v. Rhode Island*, 594 F.3d 56, 63 (1st Cir. 2010).  Although *Rodriguez* was not decided until the year after this stop occurred, *Rodriguez* was neither a departure from previous cases nor new law.

Any reasonable officer in Donley's position would have known that once he resolved the registration issue with Souza, he could not prolong the traffic stop without articulable suspicion that either the driver or passenger were committing, or had committed, a crime.  Nothing offered by the defendants supplies that suspicion.  The defendants are, therefore, not entitled to qualified immunity under federal law and, as a consequence, they are denied that immunity with respect to the R.I. Const.

Art. I sec. 6 claim as well.  *Estrada,* 594 F.3d at 63, citing *Hatch v. Town of Middletown,* 311 F.3d 83, 89-90 (1st Cir. 2002) (Rhode Island qualified immunity defense analogous to federal doctrine).

### C.  The Jury Issue of Identity

As noted *infra* at p. 2, a finding by the Court of a constitutional violation, based on facts that are either undisputed or asserted by the defendants, combined with a finding on the same facts that qualified immunity is not appropriate, would ordinarily result in an award of summary judgment on liability on Counts I and II.  However, because the question of the identity of the passenger is genuinely in dispute and is without a doubt material, the Court cannot grant summary judgment to the plaintiff.

There is no question that most of the evidence demonstrates that Eldominic Ramsey was the passenger in the car.  First, of course, there is Eldominic's own assertion of that fact.  Second, there is the assertion of the driver, Renee Sousa, that Eldominic was her passenger.  Third, the information given by the passenger – that he had no Rhode Island driver's license, his date of birth, his address, that he had once been arrested but it had been dismissed – is consistent with the passenger's identity as Eldominic.  Fourth, there is Edrick's contention that he was *not* the passenger.  And fifth, there does not seem to be any evident reason why the passenger would lie about his identity since he was not suspected of committing any crime and neither Eldominic nor Edrick was wanted on an outstanding warrant.

But slim as the evidence is that supports the opposite conclusion, Officer Donley has testified under oath at a deposition that he examined booking cards showing the faces of  both Eldominic and Edrick Ramsey, and he is certain the man

he saw in the vehicle was Edrick.   The Court cannot say that a jury could not reasonably credit the officer's testimony if it found him to be credible or found that the plaintiff's witnesses were not.   Therefore, the defendant is entitled to put that dispute before a jury, and summary judgment cannot be awarded on Count I or II to Eldominic.

### D.  Count III: Eldominic False Imprisonment Arising from the Vehicle Detention

False imprisonment is a state law claim, derived from common law.  *Dyson v. City of Pawtucket,* 670 A.2d 233, 238-39 (R.I. 1996).   False imprisonment means confinement without legal authority.  *Powers v. Carvalho*, 368 A.2d 1242, 1246-47 (R.I. 1977).   It is restraint without legal justification or color of legal authority.  *Henshaw v. Doherty*, 881 A.2d 909, 919 (2005).   Typically, arrests that constitute false imprisonment are made without a warrant or any previous legal process.  *Calero-Colon v. Betancourt-Lebron*, 68 F.3d 1, 4 (1st Cir. 1995).   For the same reasons that rendered the prolonged detention of the passenger unconstitutional, that detention constituted false imprisonment, and the defendants' motion for summary judgment on this claim is denied.   But the same factual dispute about identity precludes granting summary judgment in favor of Eldominic Ramsey on this Count. The false imprisonment claim must go to a jury to resolve the identity issue.   If that issue is resolved in Eldominic's favor, he is entitled to a verdict on liability.

### E.  Edrick's Claims:  Counts I, II, IV, V and VI, False Imprisonment, Unlawful Arrest, and Constitutional and Tort Malicious Prosecution

Edrick claims he was the victim of an unlawful arrest and a malicious prosecution, to such an extent that it rose beyond a mere state tort to the level of state and federal constitutional violations, with liability under 42 U.S.C. 1983 for a violation of civil rights.  The elements of these claims are connected, as explained below.  In the end, there are too many genuine disputes of material fact, largely stemming from the unresolvable factual issue of which Ramsey was in the car.  The identity dispute again lies at the heart of the Court's inability to grant summary judgment for either Edrick or the defendants.

Derived from the common law, the elements of malicious prosecution are: (a) an arrest made under lawful process; (b) initiated by a party acting with malice and without probable cause.  *Dyson,* 670 A.2d at 239.  Additionally, the plaintiff must prove that the prosecution initiated by the defendant(s) terminated in his or her favor.  *Henshaw*, 881 A.2d at 915. The element of lack of probable cause is, of course, an element of the constitutionally unlawful seizure claims put forth in Counts I and II.  Liability for the state tort is a condition precedent, though not a sufficient condition, to a constitutional-level claim of malicious prosecution for the violation of civil rights, as the latter also requires a showing of a deprivation of a federally-protected right.  *Nieves v. McSweeney,* 241 F.3d 46, 54 (1st Cir. 2001).

In this case, the viability of a claim for malicious prosecution rests on whether plaintiff can support the twin elements of malice on the part of Donley and lack of

probable cause for his arrest.  *Henshaw*, 881 A.2d at 915.[17]   Malice means "motivated by ill will or hostility."  *Clyne v. Doyle*, 740 A.2d 781, 783 (R.I. 1999).   If the scar on Eldominic's nose existed at the time of the stop, and in a jury's view was so prominent that it could not be missed, a jury could conclude that there was no probable cause, once Donley saw the booking cards, for him to conclude that it was Edrick in the car. It could also conclude that Donley deliberately omitted mention of the scar from the affidavit in order to obtain a warrant when otherwise, he feared, it would have been denied.   From that conclusion, an inference of malice could be drawn.  *See e.g., Rodriguez-Esteras v. Solivan-Diaz*, 266 F. Supp.2d 270, 279 (D.P.R. 2003) (if plaintiff could prove officer lied about strength of the evidence at preliminary hearing, that would be sufficient to demonstrate malice).   Moreover, the physical dissimilarity between Eldominic and Edrick could, depending on what jurors believed, support an inference that Donley was motivated by a malicious desire to demonstrate that the passenger had tried to "dupe" him, and not by a good faith interpretation of the situation.   The same factual disputes preclude summary judgment on Edrick's claims of tort and constitutionally infirm false imprisonment.   Although an officer is generally entitled to rely on a warrant to protect him or her from a false arrest claim, *Horton v. Portsmouth Police Dept.,* 22 A.3d 1115, 1124 (R.I. 2011), s/he is not protected if false information was knowingly provided.  *Henshaw,* 881 A.2d at 919. *Cf., Graff v. Motta,* 695 A.2d 486, 491 (R.I. 1997) (officer could be liable for false arrest

---

[17] The remaining two elements – that a prosecution was initiated against the plaintiff Edrick and that it terminated in his favor – are undisputed and easily met.  *Id.*

if warrant he obtained was retaliatory).  Here, a jury could conclude that the omission of the scar information was misleading enough to render the affidavit in support of a warrant tantamount to providing false information.

For these reasons, I conclude that a genuine dispute of material fact exists with respect to the state tort claim of malicious prosecution, and *a fortiori,* the constitutionalization of that claim.  *Nieves*, 241 F3d at 53.[18]  For the same reasons, a genuine dispute of material fact exists with respect to Edrick's constitutionally based claims of false imprisonment.

### F.   Qualified Immunity with respect to Edrick Ramsey

The right to be free from malicious prosecution was clearly settled at the time *Nieves v. McSweeney*, *supra* was decided in 2001, and cases in this Circuit since that time (and before the incident here occurred) have only reinforced that what was assumed *arguendo* in *Nieves* represents federal law.  *See e.g., Diaz-Colon v. Toledo-Davila*, 922 F. Supp.2d 189, 200 (D.P.R. 2013); *Rodriguez Esteras v. Solivan Diaz,* 266 F. Supp.2d at 280; *Grant v. John Hancock Mutual, Life Ins. Co.,* 183 F. Supp.2d 344, 350 (D. Mass. 2002).  The same is true of false imprisonment.  If a constitutional violation was committed at all, here, defendants Donley and Metfooney cannot be shielded from liability by qualified immunity.  Therefore, and for the reasons

---

[18] Although all the Circuits addressing this have concluded that a deprivation of liberty is sufficient to elevate a state tort malicious prosecution action to a civil rights case, the First Circuit still assumes *arguendo* that this is so.[18]  *Nieves*, 241 F.3d at 54; *Rodriguez Esteras v Solivan Diaz*, 266 F.Supp.2d at 280.  Between the *Albright* decision and 1999, every circuit considering the question had decided that "malicious prosecution by state actors may violate the Fourth Amendment."  *Id.* at 282 and cases cited therein.

supporting the denial of summary judgment on the malicious prosecution claim itself, I DENY the cross-motions of Edrick Ramsey (ECF No. 34) and of the defendants (ECF No. 32) for summary judgment.

Finally, the plaintiffs have alleged sufficient facts to support a claim under *Monell v. Dept. of Soc. Serv. of City of N.Y.,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), for insufficient training on the prolonged detention issue. *Santiago v. Fenton,* 891 F.2d 373, 381-82 (1st Cir. 1989). There was at the time clearly settled federal law and they are entitled to attempt to convince a jury that the officers' actions resulted from a lack of training on the part of the municipality,[19] approval by the City of the practice, or a deliberate indifference on its part. *Id.*

## V.

For the reasons stated herein, all motions for summary judgment (ECF Nos 32 and 34) are DENIED. However, if this case goes to trial, a directed verdict on Counts I, II and III will be entered for Eldominic Ramsey should the jury determine he was the passenger in the vehicle.

IT IS SO ORDERED:

Mary S. McElroy
United States District Judge

Date: September 30, 2020

---

[19] The plaintiffs have offered deposition testimony from supervisory Pawtucket Police personnel that offers were trained that they could demand identification information from passengers and continue a detention to pursue that questioning.